**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E D N.Y.

★ MAR 1 2 2020 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

KARIEM BROXTON,

               Petitioner,

  -against-

WILLIAM LEE,

               Respondent.

-------------------------------------------------------X

**REPORT & RECOMMENDATION**
**09-CV-5373 (DLI) (LB)**

**BLOOM, United States Magistrate Judge:**

Petitioner, Kariem Broxton,[1] files this *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his 1999 New York Supreme Court, Queens County, conviction of Murder in the Second Degree, Reckless Endangerment in the First Degree, Attempted Murder in the Second Degree, Assault in the First Degree, and Criminal Possession of a Weapon in the Second Degree. Pet. 1, ECF No. 1. The Honorable Dora L. Irizarry referred this matter to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition for a writ of *habeas corpus* should be denied.

## BACKGROUND

### I.   The Underlying Crimes

According to the evidence adduced at trial,[2] there was a shooting at a nightclub called the Owl in Queens, New York,[3] on April 20, 1997, at approximately 2:00 to 2:30 a.m. Pre-trial Tr. 8;

---

[1] Petitioner's name is spelled as both Kariem and Kareem in the record. The Court refers to Petitioner as Kariem Broxton, as this is how he spells his name on his Petition. Pet., ECF No. 1.

[2] A jury trial was held before the Honorable Randall Eng, in Queens County Supreme Court from December 6 to December 21, 1999. Trial Tr. 1, ECF No. 10 at 138. References to the trial transcript (hereinafter "T.T.") and pre-trial transcripts are to the original page number, not the ECF page numbers.

[3] The Owl was located at the intersection of Guy R. Brewer Boulevard and Farmers Boulevard in Queens County. T.T. 575, 749. The Owl was crowded that evening because the club was hosting a talent showcase

T.T. 414, 1168-69.  Multiple gunshots were fired into a crowd of approximately 200 club patrons, resulting in the death of William Beamon, and injuries to at least ten other individuals, including Fritz Davis, James Paulsaint, Jade Doyle, Damon Jones, Shawn Lock, Ernest Lawson, Shawn Gilroy, Kim Kirkland, Adrianna Brown, and Timothy Jones.  T.T. 743.  No guns were ever recovered, but a preliminary ballistics investigation found shell casings from a .9 millimeter gun and a .380 millimeter gun inside the club.  T.T. 726; Pre-trial Tr. 10-11.  Bullets from a .380 caliber gun killed Mr. Beamon and paralyzed Mr. Paulsaint.  T.T. 410; Sentencing Tr. 28.  Between April 20 and April 24, 1997, detectives interviewed a number of witnesses and conducted several photograph and lineup identifications and developed a theory that there were three shooters at the Owl that night.  See Affirm. Supp. Mot. Vacate J. ¶¶ 10-58, ECF No. 38-1 at 5-19. ECF No. 38-1 at 4, ¶ 58.

By April 24, 1997, three men had been arrested in connection with the shooting: Petitioner, Frank Straker, and Clifton Lyerly.  Affirm. Supp. Mot. Vacate J. ¶ 10, ECF No. 38-1 at 5. Petitioner, Straker, and Lyerly were all from the same neighborhood, Far Rockaway, Queens, and were known to have associated with each other. Trial Tr. 417, 876-77; Affirm. Supp. Mot. Vacate J. ¶ 59, ECF No. 38-1 at 20.  Petitioner was also known as "Cos" or "Coz;" at the time of the shooting, he was 26 years old and approximately 5'7" or 5'8" and 150 pounds.  Affirm. Supp. Mot. Vacate J. ¶¶ 10-11, 25, ECF No. 38-1 at 5, 9; Mem. Law Supp. Mot. Vacate J., ECF No. 38-1 at 46.  Straker was also known as "Born;" he was 34 years old and approximately 5'9" and 165 pounds.  Affirm. Supp. Mot. Vacate J. ¶¶ 10-11, ECF No. 38-1 at 5.  Lyerly was also known as "Knowledge;" he was 32 years old and approximately 6' 4" and 175 pounds.  Id.  The three men

---

featuring the performances of various rap artists.  T.T. 576-77, 581-82.  There were bouncers at the front door checking for weapons and other contraband but not at the rear door of the club.  T.T. 604-05; T.T. 860.

were indicted for multiple counts of Murder in the Second Degree, Reckless Endangerment in the First Degree, Attempted Murder in the Second Degree, Assault in the First Degree, Assault in the Second Degree, and Criminal Possession of a Weapon in the Second Degree. J. Eng Mem., ECF No. 9-3 at 53. Prior to trial, the court granted Petitioner's motion for severance. Affirm. Supp. Mot. Vacate J. ¶¶ 60-61, ECF No. 38-1 at 20 (citing N.Y. C.P.L. § 200.40(1) (providing that a defendant may be tried separately from co-defendants upon motion for good cause shown)); see also Pet'r's Mot. Ex. B, ECF No. 38-1 at 172 (requesting that Petitioner's case be "separated from my codefendents [sic] [b]ecause I know that they was the ones who shot the club up that night[.]").

At trial, the prosecutor argued that Petitioner and Lyerly both fired gunshots from the club's bar area and that all three defendants possessed guns and were acting in concert together. T.T. 407-412. The defense argued that the charges against Petitioner were the result of mistaken and unreliable identifications and that he did not participate in the shooting. T.T. 413, 416. Prior to the shooting, Petitioner was seen having an argument with one of the victims, Fritz Davis. T.T. 887. Catherine Goodlett, the mother of Petitioner's child, T.T. 946, testified at trial that "Fritz was trying to start an argument with [Petitioner] that night[,]" T.T. 937. She further testified that Straker walked over to Fritz, that Goodlett walked away, Petitioner walked away to another area of the bar,[4] T.T. 984-85, and shortly after, shots were fired, T.T. 938, 995. Goodlett testified that Lylerly and Straker fired the shots, and they were the only two people shooting near the bar. T.T. 938, 986-89, 999.[5] After the prosecution put on its case in chief, several of the charged counts were dismissed on the People's motion, T.T. 846-47, and the defense moved to dismiss the remaining

---

[4] During closing argument, the People maintained that Goodlett's testimony unknowingly put Petitioner, right before the shooting, at the location where discharged .380 shell casings were later recovered. T.T. 1232. See also ECF No. 38-1 at 225 (copy of crime scene diagram).

[5] After Goodlett's testimony, T.T. 932-1012, on rebuttal, the People called to the stand Sandra Beamon, William Beamon's sister, who testified that Goodlett "said her boyfriend was involved in the shooting[.]" T.T.1057.

counts, T.T. 849.[6] The Defense argued, *inter alia*, that the prosecution's evidence, at best, supported two shooters acting independently, and did not support a theory of three shooters acting in concert. T.T. 849-52.[7]

Petitioner was the first and only one of the three defendants to be tried. On December 22, 1999, the jury returned a verdict of guilty as to one count of Murder in the Second Degree, one count of Reckless Endangerment in the First Degree, one count of Attempted Murder in the Second Degree, five counts of Assault in the First Degree, and three counts of Criminal Possession of a Weapon in the Second Degree. T.T. 1386, 1403-05.

Shortly after the jury returned a guilty verdict in Petitioner's trial, on December 23, 1999, co-defendant Straker pleaded guilty to Criminal Possession of a Weapon in the Second Degree and later received a determinate sentence of five years imprisonment. Plea Minutes, ECF No. 38-1 at 181, 178; Sentencing Tr., ECF No. 38-1 at 193. During the plea proceeding, Straker admitted that he fired a .357 revolver while on the dance floor area of the Owl Club on April 20, 1997. Plea Minutes, ECF No. 38-1 at 180. The People noted on the record that no victims had been injured by a bullet from Straker's gun, and further noted that they believed that Petitioner was "the actual shooter" who killed William Beamon and paralyzed James Paulsaint. See Plea Minutes, ECF No. 38-1 at 180-81.[8] Straker was subsequently deported to Barbados in 2002. J. Modica Dec. & Order, ECF No. 40-2 at 4.

---

[6] The original indictment included 26 counts, including intentional murder and second degree assault. See T.T. 846-849; Lyerly Plea Minutes, ECF No. 38-1 at 204.

[7] The People opposed the motion, see T.T. 852-55 (arguing in support of the three-shooter and acting-in-concert theory), and Justice Eng reserved decision on the motion to dismiss, T.T. 856.

[8] During his sentencing, the People also stated that, although Straker pleaded guilty to "a weapons offense, there is no question that Billy Beamon died as a result of the gun fire that was caused by this defendant acting in concert with his two co-defendants." Sentencing Tr., ECF No. 38-1 at 193.

On January 4, 2000, Lyerly pleaded guilty to Criminal Possession of a Weapon in the Second Degree, for which he was sentenced to a determinate term of ten years imprisonment. Plea Minutes, ECF No. 38-1 at 195, 197, 201, 204; Sentencing Tr., ECF No. 38-1 at 217. Lyerly admitted that on April 20, 1997, while at the Owl Club, he possessed a .9 millimeter gun and, after someone fired a shot, he pulled out the gun and fired back multiple times. Plea Minutes, ECF No. 38-1 at 201-03. In 2005, Lyerly was released on parole; he died in 2012. J. Modica Dec. & Order, ECF No. 40-2 at 4.

## II.    Procedural Background[9]

On December 4, 2009, *pro se* Petitioner Kariem Broxton filed a petition for a writ of *habeas corpus* (the "December 2009 Petition") pursuant to 28 U.S.C. § 2254. Pet., ECF No. 1.[10] Upon reviewing the December 2009 Petition,[11] the Court noted that the petition appeared untimely under the Antiterrorism and Effective Death Penalty Act of 1996 and ordered Petitioner to show cause why the petition should not be dismissed as time-barred. Summ. Order, Mar. 23, 2010, ECF No. 2. Upon reviewing Petitioner's response to the Order to show cause, the Court found that Petitioner had made a sufficient showing that his petition was timely. Summ. Order, Oct. 4, 2010, ECF No. 4. Petitioner's application to proceed *in forma pauperis* was granted and counsel for Respondent was ordered to show cause why a writ of *habeas corpus* should not issue and to file the state court record and briefing in Petitioner's underlying criminal case. Order to Show Cause, Oct. 6, 2010,

---

[9] The Court assumes familiarity with the procedural history in this case, which is set forth in detail in Justice Modica's December 6, 2017, Decision and Order on Petitioner's second motion to vacate the judgment. See J. Modica Dec. & Order, ECF No. 40-2 at 2-14.

[10] On March 5, 2010, Petitioner also filed another habeas petition (the "March 2010 Petition"), which was found to be duplicative and was dismissed, without prejudice to the December 2009 Petition. Summ. Order, Mar. 23, 2010, ECF No. 2.

[11] References to Petitioner's December 4, 2009, Petition for Writ of Habeas Corpus are by ECF page number.

ECF No. 5. On February 7, 2011, the People filed their opposition to the December 2009 Petition. Mem. Law Opp'n Pet., ECF No. 8 (hereinafter "Resp't's 2011 Br.").

Petitioner then requested to stay his federal habeas petition to afford him the opportunity to exhaust additional grounds in state court based on newly discovered evidence. See ECF Nos. 17-19, 23.[12]    Finding that Petitioner showed good cause for his failure to exhaust and that the affidavits Petitioner submitted could potentially advance his innocence claim, the Court granted Petitioner's motion for a stay pending exhaustion of the new claims raised in Petitioner's August 11, 2011, letter. Summ. Order, Nov. 10, 2011, ECF No. 24. In addition, the Court deemed Petitioner's August 11, 2011, letter, ECF No. 23, an amendment to be incorporated with his December 2009 Petition upon exhaustion of the new claims. Summ. Order, Nov. 10, 2011, ECF No. 24.

Petitioner's family retained counsel to perform an investigation and prepare another motion to vacate Petitioner's conviction based on newly discovered evidence. Status Rep., Mar. 23, 2015, ECF No. 31; Status Rep., Aug. 28, 2015, ECF No. 32.[13]    On May 12, 2016, Petitioner filed a second motion to vacate his conviction on the grounds of newly discovered evidence, ineffective assistance of counsel, and actual innocence. Status Rep., May 16, 2016, ECF No. 33; Mem. Law Supp. Mot. Vacate J., ECF No. 38-1 at 35. The People opposed Petitioner's motion. See ECF No. 39.[14]    Justice Deborah Stevens Modica of the Supreme Court, Queens County, denied Petitioner's

---

[12] Petitioner initially requested the stay by filing a series of letters and supporting documents. See ECF Nos. 17-19. Petitioner was directed to file a letter setting forth the constitutional violation(s) he sought to challenge. Summ. Order, July 12, 2011, ECF No. 22. Petitioner responded to the Court's Order on August 11, 2011. See Pet'r's Ltr., ECF No. 23.

[13] Ms. Danielle Muscatello filed a series of status reports on Petitioner's behalf responding to the Court's Order to show cause why the stay of the federal case should remain in effect. See Electronic Order, Mar. 10, 2015; ECF Nos. 31-34.

[14] A complete set of Petitioner's May 2016 motion, including the People's opposition, Petitioner's Reply, and the state court's rulings, have been provided to the Court. See Status Rep., Oct. 10, 2018, ECF No. 38.

motion without a hearing. J. Modica Dec. & Order, ECF No. 40-2. On July 23, 2018, the Appellate Division, Second Department, denied Petitioner's application for a certificate granting leave to appeal the denial of Petitioner's May 2016 motion to vacate. Dec. & Order on Appl., ECF No. 42-1.

By letter-motion filed on September 6, 2018, Petitioner requested leave to amend the instant petition "based on the additional litigation in state court," or, in the alternative, leave "to redo my whole petition based on the additional arguments and litigation in state court." Mot. Amend, ECF No. 37.[15] Respondent opposes Petitioner's request to amend his petition. Opp'n Mot. Amend, ECF No. 43. This matter was referred to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). Electronic Order, June 20, 2019.

## DISCUSSION

### I.  Standard of Review

### A.  The Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the AEDPA, a habeas petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim's adjudication resulted in a decision that was: 1) "contrary to, or involved an unreasonable application of, clearly established Federal law,

---

[15] In addition, Petitioner requested that the Court appoint counsel to represent him in his federal case. Mot. Amend, ECF No. 37. Petitioner reiterated this request on March 18, 2019, when he asked that Ms. Muscatello be assigned to represent him in this federal habeas proceeding. See Mot. Appoint Counsel, ECF No. 44. In light of my recommendation that the Petition should be denied, Petitioner's request for the appointment of counsel is denied as moot.

as determined by the Supreme Court of the United States;" or 2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  "[W]hen a state court denies a claim that was squarely presented, there is a strong presumption that the denial is 'on the merits.'" Golb v. Attorney Gen. of the State of New York, 870 F.3d 89, 97 (2d Cir. 2017), cert. denied sub nom. Golb v. Schneiderman, 138 S. Ct. 988 (2018); see also Harrington v. Richter, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  The district court's review of a claim adjudicated on the merits in state court "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  Moreover, the AEDPA standard of review for a claim adjudicated on the merits in state court is "difficult to meet and highly deferential[.]" Golb, 870 F.3d at 97 (quoting Contreras v. Artus, 778 F.3d 97, 106 (2d Cir. 2015)).  The district court has authority to grant the petition only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

The "contrary to" and "unreasonable application of" language in § 2254(d)(1) have "independent meaning." Carmichael v. Chappius, 848 F.3d 536, 544 (2d Cir. 2017) (citing Williams v. Taylor, 529 U.S. 362, 404–05 (2000)).  "[A] petitioner may show that a state court's decision was 'contrary to' federal law, by demonstrating either (1) that the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court, or (2) that, when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' the state court arrived at a result opposite to the one reached by the Supreme Court."

8

Evans v. Fischer, 712 F.3d 125, 132 (2d Cir. 2013) (quoting Williams, 529 U.S. at 405). Whereas, a state court decision is an "unreasonable application" of federal law if "a state court 'identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Carmichael, 848 F.3d at 544 (quoting Williams, 529 U.S. at 413). A district court's conclusion that the state court incorrectly or erroneously applied federal law is not enough to establish that the state court's application of federal law was unreasonable; rather, "a petitioner 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Carmichael, 848 F.3d at 544 (quoting Harrington, 562 U.S. at 103).

Where the state court's decision is unexplained, a district court should "look through" an unexplained state court decision "to the last related state-court decision that does provide a relevant rationale" and should apply a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018);[16] Scrimo v. Lee, 935 F.3d 103, 111 (2d Cir. 2019) (explaining that federal courts look through unexplained appellate decisions to the last related decision that provides a relevant rational and apply the AEDPA § 2254(d) standard to that reasoning).

### B. Exhaustion

A petitioner in custody pursuant to a state court judgment must exhaust his state court remedies prior to seeking federal habeas review. 28 U.S.C. § 2254(b)(1); see also Davila v. Davis, 137 S. Ct. 2058, 2064 (2017) ("The exhaustion requirement is designed to avoid the 'unseemly'

---

[16] See also Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

result of a federal court 'upset[ting] a state court conviction without' first according the state courts

an 'opportunity to ... correct a constitutional violation.'") (citation omitted).  To exhaust state court

remedies, the petitioner must satisfy the "fair presentation" requirement.  Baldwin v. Reese, 541

U.S. 27, 29 (2004).  A petitioner fairly presents a claim only if the petitioner "has informed the

state court of both the factual and the legal premises of the claim he asserts in federal court," such

that the state courts were "fairly alerted" to the claim's federal nature. Bierenbaum v. Graham, 607

F.3d 36, 47, 49 (2d Cir. 2010) (citations and quotation marks omitted). See also Baldwin, 541 U.S.

at 32 (clarifying that a petitioner can "indicate the federal law basis for his claim in a state-court

petition or brief, for example, by citing in conjunction with the claim the federal source of law on

which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim

'federal.'"); cf. Acosta v. Artuz, 575 F.3d 177, 188 (2d Cir. 2009) ("[A] claim is not 'fairly

presented' to a state appellate court if discovery of that claim requires the court to 'read beyond a

petition or a brief (or a similar document)' and conduct its own review of proceedings below.")

(quoting Baldwin, 541 U.S. at 32).

## C. Procedural Default

An "important 'corollary' to the exhaustion requirement" is the procedural default doctrine,

which bars a federal court from reviewing federal claims that were "procedurally defaulted in state

court—that is, claims that the state court denied based on an adequate and independent state

procedural rule." Davila, 137 S. Ct. at 2064 (citations omitted); see also Garvey v. Duncan, 485

F.3d 709, 713-14 (2d Cir. 2007) (explaining that the state rule is adequate if it is "firmly

established," "regularly followed," and its application would not be "exorbitant") (citing Lee v.

Kemna, 534 U.S. 362 (2002)); Coleman v. Thompson, 501 U.S. 722, 735 (1991) (explaining that

a state court decision is not independent if the decision "fairly appears to rest primarily on federal

law, or to be interwoven with the federal law") (citation omitted). This procedural default bar applies only if the state court's opinion "*clearly and expressly state[d]* that its judgment rest[ed] on a state procedural bar." Garner v. Lee, 908 F.3d 845, 859 (2d Cir. 2018), cert. denied, 139 S. Ct. 1608 (2019) (citations omitted). Nonetheless, the procedural default bar remains in force, "even when the state court addresses the merits in reaching an alternative holding." Whitley v. Ercole, 642 F.3d 278, 286 n.8 (2d Cir. 2011); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("Thus, even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.") (citing Glenn v. Bartlett, 98 F.3d 721, 725 (2d Cir. 1996)). Yet, where it is ambiguous whether the state court rested its judgment on the state procedural rule, district courts should apply a presumption that the state court resolved the claim on the merits and should thus review the claim's merits. See Garner, 908 F.3d at 859-860.

Moreover, even in cases where a state prisoner has procedurally defaulted his claims in state court, a petitioner can overcome the bar to federal review of those claims if the petitioner can show 1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or 2) the bar against review would "result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. To establish the "cause" element, a petitioner "must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Davila, 137 S. Ct. at 2065 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). Attorney error can serve as such a factor and satisfy the cause element "only if that error amounted to a deprivation of the constitutional right to counsel." Davila, 137 S. Ct. at 2065 (citing Edwards v. Carpenter, 529 U.S. 446, 451 (2000)) (explaining that an attorney's ineffectiveness in failing to preserve a claim for review in state court can establish cause, but only if the assistance was "so

ineffective" that it violates the Constitution)). However, generally, an ineffective assistance claim "must 'be presented to the state courts as an independent claim before it may be used to establish cause," Edwards, 529 U.S. at 452 (citation omitted), and "an attorney's ignorance or inadvertence" in failing to raise a claim in a postconviction proceeding does not establish cause, Trevino v. Thaler, 569 U.S. 413, 422 (2013) (citation omitted).[17]  If the petitioner cannot show cause and prejudice but seeks to establish the "fundamental miscarriage of justice" exception, then he "must advance *both* a legitimate constitutional claim *and* a credible and compelling claim of actual innocence." Hyman v. Brown, 927 F.3d 639, 656 (2d Cir. 2019) (quoting Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012)) (emphases in original).

## II.     Motion to Amend

I will turn first to the threshold issue of Petitioner's motion to amend his December 2009 Petition. Petitioner requests leave to amend "based on the additional litigation in state court," or, in the alternative, leave "to redo my whole petition based on the additional arguments and litigation in state court." Mot. Amend, ECF No. 37. Petitioner argues that the reason why the Court stayed the petition was to allow Petitioner to exhaust his "claims of (Newly Discovered Evidence) and (Actual Innocence) in the lower state courts and potentially further my assertion of those claims." Id. Respondent argues that the only substantive Federal claim proposed, ineffective assistance of counsel, is both procedurally barred and meritless, and therefore permitting Petitioner to amend

---

[17] In Martinez and Trevino, the Supreme Court set out narrow exceptions, where ineffective assistance by state postconviction counsel could serve as "cause." Davila, 137 S. Ct. at 2062 (citing Martinez v. Ryan, 566 U.S. 1 (2012) and Trevino v. Thaler, 569 U.S. 413 (2013)). These exceptions do not apply to the instant case. Cf. Williams v. Rock, No. 09-CV-3576 (JS), 2014 WL 3882331, at *3 (E.D.N.Y. Aug. 6, 2014) (finding Martinez and Trevino inapplicable where New York law provided petitioner a mechanism for raising ineffective assistance claims on direct appeal).

The Clerk of Court is directed to send Petitioner the attached copies of all the unreported cases cited herein.

"would be an inefficient use of this Court's resources…and further delay a final resolution in this matter." Opp'n Mot. Amend 3, ECF No. 43.[18]

The Court already "deem[ed] Petitioner's letter filed August 11, 2011, which details the constitutional claims he raises based on the new evidence to constitute an amendment to his petition, and, upon exhaustion of those claims, to be incorporated therein." Summ. Order 2, Nov. 10, 2011, ECF No. 24 (internal citation omitted). Petitioner stated in the August 11, 2011, letter that he intended to raise a Sixth Amendment ineffective assistance claim and an Eighth Amendment claim based on Petitioner's innocence. See Pet'r's Ltr., ECF No. 23. Thus, the December 2009 Petition has already been deemed amended to add these claims upon their exhaustion. Petitioner's second motion to vacate his conviction raises newly discovered evidence, ineffective assistance of trial counsel, and actual innocence claims. See Mem. Law Supp. Mot. Vacate J., ECF No. 38-1 at 35. Liberally construed, Petitioner's August 2011 letter raises the claims that were subsequently argued in the second motion to vacate. Thus, deeming the Petition to be amended is consistent with the Court's November 10, 2011, Order, and would permit adjudication of the petition with the benefit of the complete state court record, briefing, and decision.

Thus, I will review all of Petitioner's claims, including those raised in Petitioner's second motion to vacate the conviction (hereinafter "May 2016 Petition"), but I will also consider Respondent's opposition to that motion, and the state court's decision on the same. Respondent will not be prejudiced by this approach, and Petitioner's claims will be decided altogether.

---

[18] Respondent argues that the ineffective assistance of counsel claim is procedurally barred from review because it was rejected on an independent and adequate state law ground and that Petitioner cannot overcome the procedural bar based on his newly discovered evidence and actual innocence claims because the state court found that these two claims lacked merit. Opp'n Mot. Amend, ECF No. 43.

### III.    Petitioner's Claims

The December 2009 Petition raises the following grounds for habeas relief:[19] 1) ineffective assistance of trial counsel, Pet. 8 (Point I.A); 2) ineffective assistance of appellate counsel (Points I-II), Pet. 9; 3) denial of a fair trial due to prosecutorial misconduct, including a <u>Brady</u> violation and encouraging inflammatory testimony, Pet. 8 (Points I.B, I.C); 4) an excessive sentence, Pet. 7 (Point III), Pet. 8 (Point I.E); and 5) improper jury charges, Pet. 7 (Points I-II).[20] The May 2016 Petition also raises ineffective assistance of trial counsel and adds an actual innocence claim based on newly discovered evidence. <u>See</u> Mem. Law Supp. Mot. Vacate J., ECF No. 38-1 at 35.

### A.    <u>Actual Innocence Gateway Claim</u>

As previously noted, even in the absence of a showing of cause and prejudice, Petitioner may overcome the bar to federal review of procedurally defaulted claims and have his constitutional claim considered on the merits "if he makes a proper showing of actual innocence." <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 392-93 (2013) (citations omitted). This exception requires a showing of "factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).[21] Indeed, the standard for gateway actual innocence claims is "demanding" and "seldom met." <u>McQuiggin</u>, 569 U.S. at 386 (citations omitted); <u>House v. Bell</u>, 547 U.S. 518, 538

---

[19] Petitioner does not list all the grounds on the form petition, rather he refers to attached sheets, Pet. 2-4, labeled Exhibits A through C, which list the grounds he raises and reference his prior state court proceedings, Pet. 7-9.

[20] The December 2009 Petition organizes the grounds raised based on the prior state court proceedings. <u>See</u> Pet. Ex. A (direct appeal); Pet. Ex. B (first motion to vacate pursuant to N.Y. C.P.L. § 440.10); Pet. Ex. C (Error Coram Nobis application).

[21] Actual innocence claims generally serve a gateway function and are not free-standing, substantive claims. <u>Hyman</u>, 927 F.3d at 655-56 n.20 ("Actual innocence is not itself a constitutional claim—except perhaps when raised in the context of an Eighth Amendment challenge to a capital sentence.") (internal quotation marks and citations omitted); <u>McQuiggin</u>, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.") (citing <u>Herrera v. Collins</u>, 506 U.S. 390, 404–405 (1993). An assertion of actual innocence provides "a gateway through which a habeas Petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Rivas v. Fischer</u>, 687 F.3d 514, 540 (2d Cir. 2012) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 315 (1995) quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993)).

(2006) (explaining that the standard allows federal review "only in the extraordinary case") (internal quotation marks and citations omitted).

An actual innocence claim "must be both 'credible' and 'compelling.'" Rivas, 687 F.3d at 541 (citing House, 547 U.S. at 521, 538).  To establish a credible claim, a Petitioner must "adduce 'new reliable evidence…that was not presented at trial.'" Hyman, 927 F.3d at 656 (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)); Rivas, 687 F.3d at 541.  The evidence may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[,]" Schlup, 513 U.S. at 324; however, "there are no categorical limits on the types of evidence" that a petitioner can adduce, Hyman, 927 F.3d at 660.  Although "the substance" of any new credible evidence has bearing on how compelling the evidence is, the mere fact that the evidence is credible "does not necessarily make it compelling[.]" Hyman, 927 F.3d at 662, 664.  To establish a compelling claim, the evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Hyman, 927 F.3d at 657 (quoting Schlup, 513 U.S. at 316 and citing Rivas, 687 F.3d at 541).  The evidence "need not demonstrate factual innocence to an 'absolute certainty'" and need not meet a "clear and convincing" evidence standard,[22] but "must be sufficiently credible and compelling to allow a federal court to conclude that 'more likely than not, in light of the new evidence, no reasonable juror would find [petitioner] guilty beyond a

---

[22] Although Justice Modica denied Petitioner's claims as procedurally barred, she nonetheless considered the merits "in the interest of the justice." J. Modica Dec. & Order, ECF No. 40-2 at 20.  Justice Modica reviewed the actual innocence claim under a "clear and convincing evidence" standard for a freestanding claim of actual innocence under New York law. Id. at 31-21.  Because Petitioner is no longer represented by counsel, I liberally construe Petitioner's motion to amend to include an actual innocence gateway claim, since any freestanding actual innocence claim would not be cognizable, as this is not a capital case. See supra note 21; Hyman, 927 F.3d at 656 n.20. See also Erickson v. Pardus, 551 U.S. 89, 94 (2007); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (because Petitioner is proceeding pro se, the Court reads his "papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Hyman, 927 F.3d at 657 (quoting House, 547 U.S. at 538 and citing Schlup, 513 U.S. at 327; Rivas, 687 F.3d at 541-42). In deciding whether the standard has been met, the district court does not exercise its "independent judgment as to whether reasonable doubt exists[,]" Hyman, 927 F.3d at 659 (quoting Schlup, 513 U.S. at 329); the court instead makes "a probabilistic determination" about what a reasonable juror would do in light of the totality of the evidence, Hyman, 927 F.3d at 659-60 (quoting House, 547 U.S. at 538 and citing Schlup, 513 U.S. at 331; Rivas, 687 F.3d at 542). This determination is aided by comparison to prior cases where the court found a compelling showing of innocence. See Hyman, 927 F.3d at 664-65 (noting that in Schlup, House, and Rivas, "the new evidence directly supported petitioner's factual innocence by indicating either that he *did not* commit, or *could not* have committed, the crimes of conviction.") (emphasis in original).

In deciding whether the actual innocence standard has been met, the district court's review is neither limited to the trial record nor "bound by the rules of admissibility that would govern at trial[.]" Hyman, 927 F.3d at 658 (quoting Schlup, 513 U.S. at 327). The Court "'must consider all the evidence, old and new, incriminating and exculpatory,'" and "regardless of admissibility but with proper consideration for the weight the evidence can bear in light of relevance and reliability." Hyman, 927 F.3d at 658-59 (quoting House, 547 U.S. at 538). See also Reed v. Texas, 140 S. Ct. 686, 689 (2020) ("When confronted with actual-innocence claims asserted as a procedural gateway to reach underlying grounds for habeas relief, habeas courts consider all available evidence of innocence[,]" including evidence "presented in prior habeas applications.").

In Hyman, the Second Circuit did not "foreclose the possibility that, in some circumstances, a recanted identification based on an admitted lack of knowledge, might so

'thoroughly undermine[ ] the evidence supporting the jury's verdict' as to support the probability determination required by Schlup[,]" but found that the recantation did not undermine the jury's verdict in Hyman's case in light of the totality of the evidence. 927 F.3d at 665–66. Nonetheless, the Second Circuit noted that when "a witness is recanting prior sworn testimony supporting a conviction, we expect district courts to look upon the recantation 'with the utmost suspicion.'" Id. at 660 (quoting Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007)). The Second Circuit further directed that district courts "should consider not only the recantation, but the motives that may have prompted it, the timing of the submission, any possible motive for the original testimony, any inconsistencies in the witness's account or between that account and other evidence, the plausibility or implausibility of inferences or assumptions that crediting the recantation would require, as well as all other factors generally considered in assessing witness credibility." Id. at 660-61 (citing Doe v. Menefee, 391 F.3d 147, 164–65 (2d Cir. 2004)).

Petitioner's second motion to vacate argues that newly discovered evidence shows that Petitioner is actually innocent and probably would have changed the result of Petitioner's trial had it been presented to the jury. See generally Mem. Supp. Mot. Vacate J., ECF No. 38-1 at 35-79. In support of the motion, Petitioner offered the following as newly discovered evidence of Petitioner's innocence: (1) an affidavit from the People's witness at trial, Sonia Goode, recanting her identification of Petitioner as one of the shooters; (2) an affidavit from John Worthy, who is married to Goode, indicating that the police pressured Goode into identifying Petitioner and testifying and that Goode believed that if she cooperated with the police her cooperation would benefit Worthy, who, at that time, was incarcerated; (3) an affidavit from the People's witness at trial, Mona Parris, indicating that she was not sure of her identification of Petitioner and disputing her statements to the police; (4) an affidavit from Wanda Taylor, a defense witness, who testified

at trial that she did not see the shooters,[23] now states that co-defendants Lyerly and Straker were

the shooters; (5) an affidavit from Fasimba Paul, who was not a witness at trial, stating that she

was only "two or three steps away" from Petitioner when the shooting started and thus Petitioner

could not have been the shooter, because she was so close to him that she "would have been hit"

and that the prosecution did not credit her statements regarding Petitioner's innocence; (6) an

affidavit from co-defendant Straker, stating that Petitioner did not have a gun on the night of the

shooting and that Lyerly shot at Fritz Davis;[24] and (7) a notarized letter from co-defendant Lyerly,

stating that, he did not see Petitioner with a gun on the night of the shooting and that Petitioner

was not known by him to carry a gun; and (8) an affidavit from Eric Sanders, who was dating co-

defendant Straker's sister, stating that on April 23, 1997, he was present at Straker's house when,

after speaking with her brother on the phone, Straker's sister retrieved a black .380 semi-automatic

pistol from somewhere in the home and later told Sanders that she threw the gun off the A train,

and that co-defendant Lyerly told him "on numerous occasions" that Petitioner had not taken part

in the shooting; and (9) Petitioner's own affidavit.  See id.; see also ECF No. 38-1 at 80-228 and

ECF No. 40-1 (accompanying exhibits).  Petitioner argued that, absent the identification testimony

of Goode and Parris, "the entire evidentiary landscape of the trial would have been different[,]" as

"the sole witness at trial to place a gun in Mr. Broxton's hand would have been Sheree Alexander,

---

[23] During her testimony at trial, T.T. 857-907, Taylor testified that she went to the Owl with Petitioner and Catherine Goodlett, T.T. 860.  (At the time of trial, Taylor had been living for three years with Goodlett, Petitioner's girlfriend at the time. T.T. 859, 873.)  After Petitioner, Goodlett, and Taylor arrived at the Owl, Taylor saw Lylerly and Straker, and a man named Shatik, who she said resembled Petitioner. T.T. 861-64. Taylor testified that she did not see who was shooting, T.T. 865, 890, and after she dropped down to the floor, she ran out of the club, T.T. 866, 890.  Taylor testified that she did not see Petitioner with a gun that night and that Petitioner was not inside the club when the shooting started, as he had run out the back door a few moments before when it had "looked like [Petitioner and Fritz] were getting ready to fight." T.T. 866, 874, 888-89, 905.

[24] Petitioner's counsel attempted to contact Fritz Davis but was unable to secure an affidavit from him. See Reply Affirm. Supp. Mot. Vacate J. ¶¶ 48, 50, 55, ECF No. 40 at 10-11. Davis did not testify at trial. See T.T. 854.

who testified by virtue of a previous identification." Mem. Law. Supp. Mot. Vacate J., ECF No. 38-1 at 54.[25]    In sum, Petitioner argues that the elimination of Goode and Parris' testimony, combined with the newly discovered evidence, would have probably resulted in a verdict favorable to Petitioner. Id. at 37, 54.

In response, Respondent argued, *inter alia*, that Petitioner's evidence merely impeaches or contradicts trial testimony, is not credible, could have been discovered previously with due diligence, would not change the result of a new trial, and fails to establish actual innocence. See generally Mem. Law (hereinafter "Resp't's 2017 Br."), ECF Nos. 39, 39-1.    In particular, Respondent highlights a series of contradictions comparing the motion evidence and trial evidence. See Resp't's 2017 Br., ECF No. 39-1 at 33-40 (Goode's statements);[26] id. at 43-44 (Parris' statements);[27] id. at 44-45 (Taylor's statements).    Respondent also underscores that much of the

---

[25] Petitioner also emphasizes that, at the time of the shooting, he wore "a prominent gold grill on his top front teeth[,]" and neither Parris nor Goode "mentioned the shooter having a gold grill on his teeth[.]" Mem. Law. Supp. Mot. Vacate J., ECF No. 38-1 at 73, 54. Petitioner also pointed to, *inter alia*, observations by other witnesses, including Debra Jackson and Malika Mike, who told Police that they saw a person over six feet tall shooting from the bar. Id. at 52.

[26] Sonia Goode, also known as Sonia Worthy, T.T. 615, was working as a bartender at the Owl on the night of the shooting, T.T. 575-76. Her twin sister, Iris Goode, was also working at the Owl that evening.  T.T. 603, 615. During her testimony, T.T. 572-636, Sonia Goode testified that she saw petitioner with a gun in his hand and saw him fire the gun in the direction of a chair where Fritz Davis was seated, T.T. 592-93, 635. During the defense's cross-examination of Goode, Goode testified that the description she gave to police was of a "[d]ark-complected male. I couldn't actually tell him what height. They asked me to approximate maybe by another officer, about the height. I couldn't really tell the height." T.T. 618. When defense counsel asked "Didn't you give the description that he was six feet two inches?", Goode responded, "No, I did not. They asked me to make an approximation and I'm not good with height." Id.  She also testified on cross that when she saw defendant, she "looked [at] him dead in the face," T.T. 622, 624, and the lighting near the bar area was not dim, T.T. 623.  When defense counsel asked whether the person Goode saw shooting was a tall person, Goode responded, "I told you I'm not good with height, but I know a face." T.T. 631.  Goode further testified to picking out Petitioner during a lineup identification at the 105 Precinct on April 24, 1997, three days after the shooting.  T.T. 607-09, 635. She also testified to being unable to make a positive identification of Petitioner from photographs shown to her by the police on April 20 and April 22, 1997. T.T. 628-30 ("I told him I did not want to make an identification from a photograph because I could not make a valid identification.  I saw him that night and if I saw him in person I could recognize him."); see also T.T. 632-34 (testifying to the photograph viewings on re-direct).

[27] During her testimony at trial, T.T. 649-685, Parris testified that she was working at the Owl as a coat check on the night of the shooting, T.T. 652.  She testified to seeing a young man, "approximately five-eight to five-ten" in height, kneeling on a bar stool, with a silver automatic handgun in his hand. T.T. 657-

new evidence from Parris and Goode centers on perceptions of the shooters' height; yet, their identifications were based on their recollection of the shooter's face, not height, and the issue of height was probed repeatedly at trial.[28]   See Resp't's 2017 Br., ECF No. 39-1 at 33-34, 37. Therefore, Respondent argues that the witnesses' new "flip-flop" testimony would not have changed the verdict.   Resp't's 2017 Br., ECF No. 39 at 99.

Respondent also offers additional evidence not introduced at trial in support of Petitioner's guilt.   Respondents point to Petitioner's contradictory statements made at a polygraph test.   See Resp't's 2017 Br., ECF No. 39-1 at 48-49; Reply. Mem. Supp. Mot. Vacate J., ECF No. 40 at 35. Respondent re-interviewed trial witness, Sheree Alexander, who testified at trial based on a prior photograph and lineup identification, that Petitioner was the person she saw at an intersection near the Owl with a gun in his hand, and confirmed her prior statements.   Resp't's 2017 Br., ECF No.

---

59. She testified that she never saw the man's face "directly front on" but saw "a side profile of his face[.]" T.T. 659; see also T.T. 675-76. Based on this "side profile," Parris identified Petitioner at trial as the person she saw with the gun. T.T. 660. When asked on cross-examination if she had noticed the teeth of the young man kneeling on the stool, Parris responded, "I really didn't pay attention." T.T. 677. Later, when Justice Eng asked if she noticed any gold teeth, Parris responded, "I wasn't looking for his mouth. No, I didn't." T.T. 684. She further testified that she did not see what Petitioner did with the gun at first, but later "it appeared he was shooting his way out the door." T.T. 660-62. She also testified to picking out Petitioner as the shooter during a lineup where they had the men in the lineup turn to the left and to the right. T.T. 667-68. She testified at trial that she was positive about the identification, but that at the lineup, she told the police she "wasn't sure[.]" T.T. 667-68. She explained that "I told them that this looks very much like him…I didn't tell the detectives that it was him because I was afraid. I do not know this man. I had never seen this man before. I don't know who he knows, who he does not know. I have two children and I have a life that I love. I just was afraid[,]" T.T. 668-69, but that she was willing to testify ultimately because "I'm older now and a lot of people were hurt and I would hope that had it been me or someone else, and I cared a lot for Bill, I would hope that they would tell the truth and I feel I have to, and that's why[,]" T.T. 669. On cross-examination, Parris testified that she could not make a positive identification when shown photographs by the police at the 105th Precinct on April 21, 1997. See T.T. 677-78. Parris testified that she saw two individuals with guns in their hands, but she did not see the face of the second person. T.T. 683.

Parris disclosed on the stand that the District Attorney's office was putting her up at a hotel for two nights "because I told them I wasn't comfortable testifying right now because I have concerns trying to find a place for me and my two kids to live right now… when they told me that they could put me up and at least those two days I was comfortable, I said, fine, then I could come in," T.T. 651-52.

[28] The issue of the shooter's height was raised throughout the trial. See, e.g., T.T. 553, 566, 1176.

39-1 at 49-50; see also Resp't's App., ECF No. 39-2 at 83-87.[29]  Respondent also re-interviewed

Valerie Foster, also known as Valerie Carter, who did not testify at trial, but had identified both

Petitioner and Lyerly as shooters based on a photo array and lineup and then confirmed her prior

statements.  Resp't's 2017 Br., ECF No. 39-1 at 50; see also Resp't's App., ECF No. 39-2 at 67-

74.  Other witnesses who did not testify at trial also provided descriptions of the shooter that more

closely matched Petitioner's height.  See Resp't's 2017 Br., ECF No. 39-1 at 51.  An individual

named Kareem Straughn provided a written statement that supports the narrative that Straker

handed Petitioner a gun which Petitioner then used to shoot Fritz Davis.  See Resp't's 2017 Br.,

ECF No. 39-1 at 53; see also Resp't's App., ECF No. 39-2 at 32.

Respondent also urges the Court to consider the ballistics evidence presented at trial and

the trial testimony of Gregory Larkin,[30] a former Navy technician "trained in differentiating

sounds," to corroborate the prosecution's theory that Lyerly and Petitioner shot two different

semiautomatic weapons near the bar and Straker shot a revolver on the dance floor.  Resp't's 2017

Br., ECF No. 39-1 at 53-57.  Respondent argues that this version of events is supported by Lyerly's

---

[29] Alexander testified at trial, T.T. 745-786, that, on the night of the shooting, she was in the vicinity of the Owl, driving home with her cousin, when she was stopped at a traffic light on the corner of Guy R. Brewer and Farmers Boulevards, T.T. 751-52, and saw "a male black walk up to the car and he had a gun at his waist[,]" T.T. 760, and "about 30, 40 individuals just running frantic" near the club, T.T. 761.  Alexander was sitting on the passenger side of the car, when the man with the gun approached the driver's side of the car in the roadway, but she was able to see the man from the waist up, including the front of his face.  T.T. 762-65.  Alexander estimated that the man was "five-five to like five-eight, approximately" in height.  T.T. 766.  After seeing the man with the gun, Alexander and her cousin drove off and did not report anything to the police that night.  T.T. 768.  Alexander disclosed at trial that she was subsequently arrested on April 22, 1997, for a suspended license at a police checkpoint at the same intersection, at Guy R. Brewer and Farmers Boulevards.  T.T. 770-71.  The police officer told her "he could help me out if I knew of any crime[,]" T.T. 773, and Alexander told them about what she saw on the night of the shooting, T.T. 772.  Alexander admitted that she told the police about what she saw outside the Owl in order to secure a benefit surrounding her arrest, T.T. 775, and that she was subpoenaed to testify, which she perceived as a threat, T.T.785-86.  Alexander's arrest resolved prior to trial when Alexander plead guilty to the suspended license infraction and paid a fine.  T.T. 774.  Alexander testified that she would not be able to recognize the man she saw with the gun two and a half years later at trial, but that she got a good enough look at his face that she could have recognized the man within days of the shooting.  T.T. 766-67.
[30] See T.T. 501-535.

and Straker's plea allocutions. Id. at 53. Respondent further asserts that Petitioner had a motive to shoot because of his argument with Fritz Davis. Id. at 63.[31]

Having thoroughly reviewed the record, I conclude that Petitioner does not meet the "credible and compelling" threshold necessary to establish the actual innocence gateway. Much of Petitioner's post-trial evidence lacks indicia of credibility. Moreover, although Petitioner's evidence points to Lyerly's guilt as one of the shooters at the Owl on April 20, 1997, this is less compelling in a case like this, where the prosecution's theory was that there were three shooters, one of whom was Lyerly, and the evidence does not rule out that Petitioner was a third shooter that night.[32] Cf. Hyman, 927 F.3d at 665 (finding that the new evidence made "a far 'lesser showing'" than in Rivas, House, or Schlup where the eyewitness recantation left the trial record with no eyewitness identification of the petitioner as the person who was shooting from a car, but noting that "the absence of such evidence does not mean that [petitioner] did not, or could not, have participated in the shootout."). Moreover, some of the new evidence could be described as the type of "eleventh-hour affidavit vouching for a defendant and incriminating a conveniently absent suspect[,]" House, 547 U.S. at 552, which should be "treated with a fair degree of skepticism[,]" Herrera, 506 U.S. at 423 (O'Connor, J., concurring). Although the timing of Petitioner's second motion to vacate does not render it incredible, it is not insignificant that the

---

[31] At trial, Goodlett contested that Fritz and Petitioner were fighting, about to fight, or fighting over her, T.T. 977-79; however, the prosecution's theory was that Petitioner had a motive to shoot because his "manhood was being challenged" in front of his girlfriend, see T.T. 1278-81.

[32] Petitioner argued that the evidence shows, by a clear and convincing standard, that Lyerly shot Fritz Davis and that Straker and Lyerly were the only shooters at the Owl on April 20, 1997. Mem. Law. Supp. Mot. Vacate J., ECF No. 38-1 at 73-79. However, a notarized letter signed by Lyerly and offered by Petitioner as supporting his position, Affirm. Supp. Mot. Vacate J. ¶ 113, ECF No. 38-1 at 33, contradicts Petitioner's theory that there were only two shooters. Lyerly states in that letter: "That night someone shot at me and I shot back at them it was more then [sic] just me with a gun it was about fore [sic] or five people with guns the night Mr. Billy Beamon, got killed in the Owl Club. I did not see or know Mr. Kareem Broxton, to have a gun that night or no other night so how could the jury find Mr. Kareem Broxton, guilty after trial for murder knowing fore to five people had guns in the Owl Club that night." ECF No. 38-1 at 224.

motion was filed after Lyerly and Straker were unlikely to suffer any consequences, as Lylerly is dead and Straker was deported. Cf. McQuiggin, 569 U.S. at 400 n.4 ("A showing that delay was part of a deliberate attempt to manipulate the case, say by waiting until a key prosecution witness died or was deported, might raise a different ground for withholding equitable relief."). In sum, I conclude that Petitioner fails to satisfy the actual innocence fundamental miscarriage of justice exception.[33]

## B. Ineffective Assistance of Counsel Grounds

Throughout his state court proceedings, Petitioner asserted various claims of ineffective assistance of counsel, both at the trial and appellate level.[34] The claims are too numerous to repeat here. See, e.g., ECF No. 9-3 at 5-6 n.28 (enumerating twelve claims of ineffective assistance of trial counsel in briefing on first motion to vacate the judgment); J. Modica Dec. & Order, ECF No. 40-2 at 29 (noting that Petitioner raised "at least thirteen" ineffective assistance claims in his second motion to vacate the judgment). Many of the claims were deemed procedurally defaulted; others were decided on the merits. I will address the most serious claim in detail.[35]

---

[33] Needless to say, Petitioner would not be able to meet the higher threshold for a freestanding actual innocence claim, even if such a claim were cognizable.

The Court notes that petitioners raising actual innocence gateway claims face "a hurdle raised high by precedents, presumptions, standards of review, and strict deference to state court rulings[,]" and petitioners can come "uncomfortably close" to reaching this hurdle and yet ultimately fail because "it is not enough to show that the prosecution's case is lacking: a petitioner must set forth evidence of 'factual innocence, not mere legal insufficiency.'" See Hyman, 927 F.3d at 671 (Jacobs, J., concurring) (quoting Bousley, 523 U.S. at 623).

[34] Petitioner was represented by retained counsel throughout the state court proceedings. At trial, Petitioner was represented by Barbara Emanuel Pershay. T.T. 1; see also Broxton Aff. ¶ 2, ECF No. 40 at 74. Appellate Advocates was relieved of its obligation to pursue Petitioner's appeal when Petitioner retained Mr. Damond Carter. Reply Affirm. Supp. Mot. Vacate J., ECF No. 40 at 3. Petitioner's family subsequently retained Mr. Robert DiDio, who filed an application for a Writ of Error Coram Nobis on Petitioner's behalf. Id., ECF No. 40 at 5. In 2010, Petitioner's family retained Mr. Didio's office again to file a second motion to vacate. Id., ECF No. 40 at 7.

[35] It is also worth noting that Petitioner's second motion to vacate argued that trial counsel was ineffective because, at the Wade hearing, trial counsel did not object to "the prosecutor's proposal to refer to all civilian witnesses by number only, and she stipulated to the redactions of the names of each witness who participated in an identification procedure...thereby impairing counsel's ability to conduct a vigorous pre-

Petitioner argued in his first motion to vacate that trial counsel was ineffective because she failed "to thoroughly explain" to Petitioner his maximum potential sentencing exposure if he lost at trial as compared to accepting two plea offers, of six to twelve years and of five to ten years. Aff. Supp. Mot. Vacate J. Ex. A, ECF No. 9 at 14.[36] See also Br. Supp. Def.'s Mot. Vacate J., ECF No. 9 at 75 ("counsel failed to provide Broxton with *counsel's wisdom,* with respect to people's plea offers of 5 to 10 years or 6 to 12 years...In effect counsel failed to comply with her obligation to explain to Broxton his consequential exposure provided he was convicted after

_____

trial investigation in Mr. Broxton's defense." Mem. Law. Supp. Mot. Vacate J., ECF No. 38-1 at 56 (internal citation omitted). However, Respondent countered that this claim is belied by the record given that trial counsel arguably had no basis to object to the redactions at that time and, subsequent to the Wade hearing, the prosecutor provided trial counsel not only the names of the numbered witnesses but also the addresses, phone numbers, and birth dates of certain witnesses. Resp't's 2017 Br., ECF No. 39-1 at 14-15 (citing Resp't's App. 117, ECF No. 39-2 at 90-93, and Sentencing Tr. 16, ECF No. 10-8 at 164).

[36] Petitioner's post-conviction counsel, Mr. Carter, swore that:

> [A]t the close of Broxton's pretrial hearing, the Court asked the District Attorney whether it had made a plea offer to the Defense, to which the District Attorney replied no and that thereafter, after having a discussion at the bench, counsel returned to Broxton and stated that the District Attorney was offering to Broxton as a plea bargain, 6 to 12 years, to which Broxton replied no, and that after a second discussion, the District Attorney then offered Broxton 5 to 10 years as a plea bargain and that counsel returned to Broxton shaking her head no, saying that we are going to win trial and that counsel never explained to Broxton anything beyond this with respect to Broxton's exposure upon conviction versus having taken the 5 to 10 year sentence, as had Broxton been informed by counsel that his exposure was in effect life without the possibility of parole, as compared to the plea bargain sentence of 5 to 10 years or 6 to 12 years, Broxton would have taken either plea offer[.]

Mr. Carter subsequently produced an affidavit from Petitioner, Aff. Supp. Mot. Vacate J., ECF No. 9-3 at 17, swearing that:

> [D]uring trial, just after my pretrial hearings the trial court asked whether there had been any disposition offered in my case to which the District Attorney said no...[A]s a result, just after my pretrial hearings, my first disposition was 6 years to 12 year [sic], my attorney returned to me at the defense table with that number and asked me if I would take that, I told her no...[A]s a result [] of my rejection, my trial counsel returned to the District Attorney for more talks and returned to the defense table with an offer of 5 years to 10 years and asked me if would I take that plea offer; in deciding whether to take that plea offer, trial counsel was shaking her head from left to right saying not to take it, as a result, I rejected that latter offer as well...[T]trial counsel never advised me whether or not to take the foregoing plea offers; trial counsel never advised me of my potential exposure if convicted of the crimes in question.  If I had been properly advised of my plea options I would have taken either of the foregoing plea offers.

This affidavit is primarily typewritten, but the last line above was written by hand and initialed.

a jury trial or whether such a plea was desirable."). (emphasis in original).  In a subsequent submission, Petitioner's post-conviction counsel stated that although he made "as many as sixty calls" to trial counsel, he was unable to obtain an affidavit from trial counsel and, during an initial July 2002 phone call, Mr. Carter "did not get an opportunity to discuss [Petitioner's] claim of ineffectiveness with respect to the Defense's plea claim[.]"  Aff. Supp. Def.'s Mot. Vacate J. ¶¶ 1, 7, 11-13, ECF No. 9-3 at 10-11.  Respondents argued that Petitioner's claim was not properly substantiated.[37]  Justice Eng found that petitioner's claim that trial counsel failed "to advise defendant to accept a plea of...five to ten years" related to matters outside the record and was not subject to a mandatory procedural bar, but ultimately denied the claim without a hearing.  J. Eng Mem., ECF No. 9-3 at 58-59 (citing N.Y. C.P.L. § 440.30[1], § 440.30[4] [d]).

In Hill, the Supreme Court "established that claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in Strickland."  Missouri v. Frye, 566 U.S. 134, 140 (2012) (citing Hill v. Lockhart, 474 U.S. 52, 57 (1985)).  To establish a Sixth Amendment ineffective assistance of counsel claim, Petitioner must demonstrate both that: (1) "counsel's performance was deficient" as measured by an "objective standard of reasonableness,"[38] and (2) the "deficient performance prejudiced the defense."  Strickland v.

---

[37] "[D]efendant does not supply any factual evidence that the People had offered him a sentence of five to ten years imprisonment...defendant fails to submit an affidavit from his trial counsel or anyone with personal knowledge of the facts in support of his claim. Because defendant's motion contains no sworn allegations of fact by any individual having actual knowledge, that the offer was made, that if it was made that it was not thoroughly discussed with defendant, or that defendant would have accepted the offer, defendant's claim should be rejected." Mem. Law Opp'n Mot. Vacate J., ECF No. 9-4 at 69.

[38] The first prong of New York's test for "meaningful representation" is effectively the same as the first prong of Strickland. Gross v. Graham, No. 16-3220, 2020 WL 628738, at *2 (2d Cir. Feb. 11, 2020) (summary order) (citing Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010)). The New York Court of Appeals "views the New York constitutional standard as more generous toward defendants than Strickland[,]" but "[p]roperly applied," the New York standard "is not contrary to Strickland." Rosario v. Ercole, 601 F.3d 118, 124, 126 (2d Cir. 2010). To the extent that Petitioner argued in his December 2009 petition that New York's "Meaningful Representation Rule" was rendered unconstitutional by Justice Eng's decision, this claim is not supported by the facts of this case or the case law.

Washington, 466 U.S. 668, 687-88 (1984). "In assessing prejudice, we consider the cumulative effect of the errors committed by counsel." Gross v. Graham, No. 16-3220, 2020 WL 628738, at *2 (2d Cir. Feb. 11, 2020) (summary order) (citing Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001)). Considerable deference is accorded to counsel's performance, as counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690; see also Bierenbaum v. Graham, 607 F.3d 36, 50 (2d. Cir. 2010) (stating that the Strickland standard is "highly deferential" to eliminate the "distorting effects of hindsight"). "When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, our cases require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013) (internal quotation marks and citation omitted).

In Frye, the Supreme Court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Frye, 566 U.S. at 145 (finding that defense counsel's performance was deficient under Strickland where counsel did not communicate formal plea offers to the defendant and the offers subsequently lapsed); see also Burt, 571 U.S. at 22 ("Although a defendant's proclamation of innocence does not relieve counsel of his normal responsibilities under Strickland, it may affect the advice counsel gives."). The Second Circuit has not announced a *per se* rule that "an attorney must always inform a defendant about possible consecutive sentences[,]" rather "an attorney 'should *usually* inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will *most likely* be exposed."

Page v. Martuscello, No. 10 CIV. 9699, 2011 WL 3678820, at *24 (S.D.N.Y. Aug. 23, 2011), report and recommendation adopted, 2013 WL 1092825 (S.D.N.Y. Mar. 15, 2013), aff'd, 561 F. App'x 118 (2d Cir. 2014).

Where a petitioner alleges that ineffective assistance led to the rejection of a plea offer and standing trial is the prejudice alleged, the petition "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler v. Cooper, 566 U.S. 156, 164 (2012) (noting that this rule is "consistent with the test adopted and applied by other appellate courts[,]" and citing United States v. Gordon, 156 F.3d 376, 380–81 (2d Cir. 1998)); see also Frye, 566 U.S. at 147 ("To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel."). A petitioner can make such a showing by "producing both a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for his counsel's deficient performance and also some additional 'objective evidence' supporting his claim." United States v. Frederick, 526 F. App'x 91, 93 (2d Cir. 2013) (summary order) (citing Gordon, 156 F.3d at 381). Additional "objective evidence" of prejudice may include a significant sentencing disparity between the plea offer and the sentence actually imposed, but the Second Circuit "did not create a per se rule that a petitioner is always prejudiced when there is a significant sentencing disparity; rather, such disparity is simply a factor for a court to consider in addressing

prejudice." Page, 2011 WL 3678820, at *27. Analysis of Strickland's prejudice prong in effect entails a factual determination regarding credibility and "the likelihood that [petitioner] would have accepted the plea bargain if he had been fully informed of its terms and accurately advised of the likely sentencing ranges under the plea bargain and upon conviction after trial[.]" Id., at *26 (quoting Cullen v. United States, 194 F.3d 401, 405 (2d Cir. 1999)).

Justice Eng's denial of Petitioner's ineffective assistance claim was not "contrary to" or "an unreasonable application" of Strickland.[39]  Petitioner failed to establish a reasonable probability that he would have accepted the plea but for the ineffective assistance of his trial counsel. Even assuming arguendo that trial counsel's performance was deficient, Petitioner has repeatedly acknowledged that he refused the plea because he maintained his innocence and wanted to proceed to trial, not because he did not understand his potential sentencing exposure. See, e.g., Sentencing Tr. 43, ECF No. 10-8 at 191 ("the [District Attorney] knows that Straker had a 380 which killed Billy Beamon and...Lyerly had a 9 millimeter and they copped out to the crime...because they did the crime, and they're all doing 6 to 12...If I know I had anything I would have took it, I wouldn't go to trial.  I'm not stupid."); Pet'r's Aug. 11, 2011, Ltr., ECF No. 23 ("Petitioner has maintained his innocence from the inception of his incarceration despite being offered several plea's by the prosecution. The reason petitioner has never excepted those plea's is because petition is innocence."); Pet'r's Mar. 18, 2011, Ltr., ECF No. 18 at 2 ("Petitioner was the only defendant to go to trial due to wanting to prove my innocence despite being offered a plea.").[40]

---

[39] Justine Eng denied Petitioner's plea claim without specifically addressing its merits, see J. Eng. Mem, ECF No. 9-3 at 58-63, but the state court's decision is nonetheless entitled to AEDPA deference. See also App. Div. Dec. & Order, ECF No. 9-7 at 20-21 (affirming Justice Eng's decision without mentioning the plea claim).
[40] Respondent also states that "the record indicates that the Court offered [Petitioner] the minimum of fifteen years to life, all to run concurrently, and [Petitioner] rejected it several times."  Mem. Law Opp'n Mot. Vacate J., ECF No. 9-4 at 97 (citing Resp't's App, Ex. 2, ECF No. 9-4 at 118).

Petitioner's repeated assertions of innocence undercut his contention that he would have taken a plea if counsel had properly advised him regarding his maximum sentencing exposure at trial. See Mittal v. United States, 471 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) ("While the defendant's assertions of innocence, despite the powerful evidence against him, are not dispositive of whether the defendant would have pleaded guilty if advised to do so, they undercut the credibility of his assertion that he would in fact have pleaded guilty."); cf. Batista v. United States, No. 14 CV 895 (DLI), 2018 WL 1556880, at *10 (E.D.N.Y. Mar. 30, 2018), aff'd, 792 F. App'x 134 (2d Cir. 2020) (finding that petitioner's "protestations of innocence throughout trial and in his Petition undermine the credibility of his self-serving assertion" and "any inference that he would have accepted the plea offer.") (citing Meszaros v. United States, 201 F. Supp.3d 251, 276 (E.D.N.Y. Aug. 15, 2016)).  Justice Eng, having presided over the pre-trial and trial proceedings, was in the best position to gauge the credibility of Petitioner's claim that he would have taken the plea,[41] and his decision was not "an unreasonable determination of the facts."  Petitioner's ineffective assistance of counsel claim on this ground should be denied.

Furthermore, Petitioner's trial and appellate counsel's alleged errors have been scrutinized by post-conviction counsel over the course of the state court proceedings.  However, Justice Eng observed that "[t]rial counsel zealously and competently represented defendant[,]" J. Eng Mem., ECF No. 9-3 at 59, and ultimately concluded that Petitioner failed to show that he was denied the

---

[41] The record reflects that, on April 7, 1999, during a Wade/Dunaway hearing, Pre-trial Tr. 107, Justice Eng held an off-the-record conference regarding a plea offer, id. 136-37.  After holding the conference, Justice Eng addressed Mr. Broxton on the record, stating "I recommend to you that you consider [the plea offer] seriously." Id. 137.

effective assistance of counsel, id. at 63.[42]  The Appellate Division affirmed.[43]  The Appellate

division also denied Petitioner's application for a Writ of Error Coram Nobis due to ineffective

assistance of appellate counsel, holding that Petitioner "failed to establish that he was denied the

effective assistance of appellate counsel[.]" App. Div. Dec. & Order, ECF No. 9-10 at 3 (citations

omitted).[44]  Justice Modica then denied Petitioner's ineffective assistance of trial counsel claims

as procedurally barred.  See J. Modica Dec. & Order, ECF No. 40-2 at 28-29 ("Despite having his

ineffective assistance of counsel claims denied on numerous occasions by numerous courts, the

defendant now alleges that his current ineffective assistance of counsel claim is not simply

repackaged arguments, but 'a mixed ineffective assistance [of] counsel claim' with a 'combination

of errors, some appearing on the record, and some appearing outside of the record.' The Court

disagrees.").

　　　Having reviewed the entire record, I conclude that the state court's decisions on Petitioner's

ineffective assistance of counsel claims were not contrary to or an unreasonable application of

---

[42] Justice Eng noted that many of the ineffective assistance claims related to matters on the record, which would have permitted appellate review, and thus were procedurally barred from review on the motion to vacate. J. Eng Mem., ECF No. 9-3 at 55-57. However, Justice Eng noted that many of the other ineffective assistance claims were "not subject to a mandatory bar," and went on to conclude that Petitioner "failed to allege claims which would constitute a lack of 'meaningful representation.'" Id. at 58-59 (internal citation omitted).

[43] The appeal of petitioner's first motion to vacate was later consolidated with his direct appeal. See ECF No. 9-5 at 51-52. The Appellate Division held that the ineffective assistance of trial counsel claim, "to the extent it is not procedurally barred…, was largely based upon unsubstantiated conclusory allegations and thus was properly denied without a hearing…In any event, the defendant failed to make out a prima facie case that there were no strategic or other legitimate explanations for counsel's alleged shortcomings, or that he was deprived of meaningful representation." App. Div. Dec. & Order, ECF No. 9-7 at 21 (internal citations omitted).

[44] The application for a Writ of Error Coram Nobis was based on appellate counsel's failure to raise certain ineffective assistance claims, "inadequate appellate writing and analytical skills[,]" and failure to properly raise an excessive sentence claim by "merely tack[ing] on a conclusory 'excessive sentence' claim at the end of a purported second 'direct appeal' brief that he filed late and without court permission." Affirm. Supp. Mot. Writ Error Coram Nobis ¶¶ 2, 5, ECF No. 9-8 at 113-115 (emphasis in original).  Petitioner's application for a Writ of Error Coram Nobis was denied and the Court of Appeals denied Petitioner leave to appeal.  See ECF No. 9-10 at 3, 8.

clearly established Federal law, nor were they an unreasonable determination of the facts. Indeed, Justice Modica observed in her decision on the second motion to vacate that it is not "odd that out of a trial transcript of one-thousand-four-hundred-and-eleven (1411) pages and a hearing transcript of one-hundred-thirty-seven (137) pages, the defendant's attorneys were able to isolate at least thirteen instances of alleged failure." J. Modica Dec. & Order, ECF No. 40-2 at 30. I also conclude that, because the attorney errors alleged neither individually nor cumulatively meet the Strickland standard, Petitioner cannot meet the cause and prejudice test to overcome any procedural bar based on ineffective assistance of counsel.

### C. Prosecutorial Misconduct Grounds

Petitioner argues that his right to a fair trial was denied because of the People's prosecutorial misconduct. He raises two grounds of prosecutorial misconduct. First, Petitioner alleges that Elizabeth Broxton, Petitioner's mother, witnessed Assistant District Attorney Shaffer (ADA Shaeffer) encouraging James Paulsaint to "make an emotional plea" when retrieving Paulsaint from the hallway outside the courtroom just prior to his testimony, and then elicited prejudicial testimony from Paulsaint contrary to a court order. Aff. Supp. Mot. Vacate J. Ex. A ¶ 10, ECF No. 9 at 16; Elizabeth Broxton Aff. Supp. Mot. Vacate J., ECF No. 9-3 at 13. Second, Petitioner alleges that the People committed a Brady violation.

1.    Claim of Improperly Eliciting Prejudicial Testimony[45]

"[W]hile the State has a 'duty to refrain from improper methods calculated to produce a wrongful conviction,' such methods will warrant habeas relief only if they 'so infected the trial

---

[45] Justice Eng found that Petitioner's claim "that the People improperly elicited prejudicial testimony as to Paulsaint's injuries in defiance of a Court order" was procedurally barred as "based on facts appearing on the record and the appeal in this matter is pending." J. Eng Mem., ECF No. 9-3 at 56-57. However, the Appellate Division's ultimate denial of this claim is entitled to AEDPA deference. See App. Div. Decision & Order, ECF No. 9-7 at 21 (stating that Petitioner's "prosecutorial misconduct and related Brady violation claims were also without merit to the extent they were not barred.") (internal citation omitted).

with unfairness as to make the resulting conviction a denial of due process[.]'" Jackson v. Conway, 763 F.3d 115, 146 (2d Cir. 2014) (quoting Berger v. United States, 295 U.S. 78, 88 (1935) and Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)) (internal quotation marks and citations omitted).   The relevant inquiry is a "narrow one of due process," Jackson, 763 F.3d at 146 (quoting Darden, 477 U.S. at 180), while at the same time, the Darden prosecutorial misconduct standard is "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations" regarding whether a prosecutor's conduct rises to the level of denying the defendant a fair trial. Parker v. Matthews, 567 U.S. 37, 48 (2012) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).   The district court considers "the record as a whole" to determine the impact of the alleged prosecutorial misconduct "because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context." Jackson, 763 F.3d at 146 (citing  United States v. Young, 470 U.S. 1, 16-17 (1985); Darden, 477 U.S. at 182; DeChristoforo, 416 U.S. at 647–48). See also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."); Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (looking to whether the prosecutor's comments were "so egregious as to violate the defendant's due process rights.").

Here, even taking as true that the prosecutor urged Mr. Paulsaint to make an emotional plea to the jury, Petitioner has not established that this conduct "so infected the trial with unfairness" to meet the Darden standard. The defense had objected that testimony from Paulsaint, who was 24 years old when he was permanently paralyzed as a result of the shooting, T.T. 562,[46] would be

---

[46] Mr. Paulsaint was hit by a bullet that severed his spinal cord. T.T. 561.

unduly prejudicial as it would "only serve to inflame [the jurors] and arouse sympathy," T.T. 537, whereas the People argued that Paulsaint was not only a victim but also a witness to the events on the night of the shooting, T.T. 538. Justice Eng allowed Paulsaint's testimony as "material and relevant and not cumulative[,]" id., and the prosecution was permitted to "develop fully his injuries and his limitations[,]" T.T. 539; however, to address the defense's concerns, Paulsaint, who used a wheelchair, was seated outside the presence of the jury prior to his testimony, T.T. 538-39. During Paulsaint's testimony, T.T. 540-568, during which he testified to his recollection of the shooting, the prosecutor also asked Paulsaint on direct to describe his physical impairments resulting from the gunshot injury, T.T. 562-63.[47] Paulsaint described his pain and injuries and their impact on his ability to manage daily living activities, T.T. 563-66, but his testimony did not "so infect[] the trial with unfairness" that Petitioner was denied due process. Therefore, Petitioner's claim regarding the prosecutor's alleged misconduct should be denied, as the state court's decision was not contrary to or an unreasonable application of clearly established Federal law.

    2.    Petitioner's Brady Claim

    To establish a Brady claim, a petitioner must show: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Fernandez v. Capra, 916 F.3d 215, 221 (2d Cir. 2019) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)). See also Strickler, 527 U.S. at 290 (citation

---

[47] The People noted in their appellate brief that "Defendant was charged with first-degree assault pertaining to the injuries sustained by James Paulsaint. In order to prove defendant's guilt to this crime, beyond a reasonable doubt, the People were required to establish the element of serious physical injury." Resp't's 2006 Br., ECF No. 9-7 at 11 (citing N.Y. Penal Law § 120.10(3)).

omitted) ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'").

Here, in support of the Brady claim, Petitioner introduced an affidavit from Frank Straker, dated November 30, 2001, that is both heavily redacted and contains handwritten notes over typewritten text. See Straker Aff. Supp. Mot. Vacate J., ECF No. 38-1 at 219-22.[48] The affidavit states, *inter alia*, that:

> Upon being arrested for this crime, I informed the NYPD or D.A. authorities, prior to [Broxton's] trial that [Broxton] at no time possessed or shot a firearm while standing at or near the bar area near Fritz. The NYPD or D.A. spoke to me several times while I was in jail. During those discussions, I informed the NYPD or D.A. that I had fired a firearm. Similarly, I so informed the NYPD or D.A. that Knoweldge had also fired a firearm. Moreover, I so informed the NYPD or D.A. that [Broxton] at no time possessed or shot a firearm while standing at or near the bar area near Fritz. Moreover, that [Broxton] did not possess or shoot a firearm while in the Owl. The NYPD or D.A. simply replied that it did not believe me." Id. ¶ 21, ECF No. 38-1 at 221.

In opposition, the People submitted an affidavit from Richard Schaeffer, one of the assistant district attorneys who prosecuted Petitioner's case and "who arranged and attended all of the interviews that were conducted with Frank Straker after Frank Straker was indicted and prior to the trial of defendant." Schaeffer Aff. ¶¶ 1, 3, ECF No. 9-4 at 113-14. Schaeffer states that "Straker never told me, nor did he tell any police officer in my presence, that defendant never fired or possessed a gun while standing at the bar of the Owl Club." Id. ¶ 3.

Justice Eng reviewed Petitioner's claim that he was "deprived of his Constitutional right to Brady material" but ultimately found the claim was without merit. J. Eng Mem., ECF No. 9-3 at 62. Justice Eng found that Petitioner had "not shown that the People or police were aware" of a statement by Straker that defendant did not possess or shoot a gun. Id. Further, Justice Eng found

---

[48] Petitioner's appellate counsel stated that the redactions reflect the deletion of "miscommunications" appellate counsel had with Mr. Straker. Affirm. Supp. Mot. Vacate J. ¶ 14, ECF No. 9-3 at 11-12.

that "there is no showing of a reasonable possibility that the failure to disclose the statement in

question contributed to the guilty verdict."[49] Id. at 62-63 (explaining that "[i]f the omitted evidence

creates a reasonable doubt that did not otherwise exist, a constitutional error has been committed.

The omission must be evaluated in the context of the entire record.") (internal citations omitted).[50]

The state court's decision on Petitioner's Brady claim is entitled to AEDPA deference.  In essence,

Justice Eng concluded that there was no suppression of Straker's statement, because the police and

prosecution were not aware of Straker's statements, and in any event, that any suppression did not

prejudice Petitioner.  As the state court's decision regarding Petitioner's Brady claim was not

contrary to or an unreasonable application of clearly established Federal law, nor was it an

unreasonable determination of the facts, Petitioner's claim should be denied.

### D. Improper Jury Charges

The first two grounds in Petitioner's December 2009 Petition relate to improper jury

instructions.  Specifically, Petitioner asserts that he was denied his right to a fair trial because the

trial court 1) "improperly incorporated the Zone of Danger test when it charge[d] the jury on

accomplice liability;" and 2) did not "instruct the jury to evaluate witness Goode's alleged prior

inconsistent description of the defendant" and "unfairly mentioned the line-up identifications by

Goode and Parris[.]" Pet., ECF No. 1 at 7.  Respondent argues, *inter alia*, that these grounds are

not cognizable claims for a Federal *habeas* proceeding because these jury instruction grounds

---

[49] Justice Eng applied New York's "reasonable possibility" standard, which is "more favorable" to
defendants and easier to meet than the federal "reasonable probability" standard. See People v. Vilardi, 76
N.Y.2d 67, 72, 77-78 (1990).

[50] The New York Appellate Division, Second Department, affirmed Justice Eng's decision to deny
Petitioner's motion to vacate without a hearing, stating that Petitioner's "prosecutorial misconduct and
related Brady violation claims were also without merit to the extent they were not barred. The
defendant failed to establish that the People were ever in possession of the purported Brady material
at the time of trial or that it was exculpatory in nature." App. Div. Dec. & Order, ECF No. 9-7 at 21
(internal citations omitted).

concern alleged errors of state law, not Federal law, Resp't's 2011 Br. 3-4, ECF No. 8 at 6-7, and

the state court's decision on the merits was not contrary to or an unreasonable applicable of clearly

established Federal law. Resp't's 2011 Br. 5, ECF No. 8 at 8. The Appellate Division upheld both

jury instructions as properly given, denying the motion on the merits, while also noting that, "[i]n

any event, any error in the trial court's charge to the jury was harmless in light of the overwhelming

evidence of the defendant's guilt." App. Div. Dec. & Order, ECF No. 9-7 at 18-19 (internal citation

omitted).

"The adequacy of a state jury charge is generally a question of state law, and is not

reviewable in a federal habeas corpus petition absent a showing that the charge deprived the

defendant of a federal constitutional right." Wright v. Charles Lee, No. 3:09-CV-01206 (SRU),

2017 WL 2938193, at *6 (D. Conn. July 10, 2017), appeal dismissed sub nom. Wright v. Lee, No.

17-2458, 2017 WL 7512844 (2d Cir. Dec. 6, 2017), cert. denied sub nom. Wright v. Erfe, 138 S.

Ct. 2605, 201 L. Ed. 2d 1008 (2018) (citing Cupp v. Naughten, 414 U.S. 141, 146 (1973)). "To

warrant habeas corpus relief with regard to an improper jury instruction, a petitioner must establish

that the instruction 'so infected the entire trial that the resulting conviction violates due process.'"

Wright, 2017 WL 2938193, at *7 (citing Estelle v. McGuire, 502 U.S. 62, 72 (1991)). "When

analyzing a claim of an improper jury instruction, the court must examine the instruction 'in the

context of the charge as a whole' and the entire trial record." Wright, 2017 WL 2938193, at *7

(citing Francis v. Franklin, 471 U.S. 307, 315 (1985)). Because the Appellate Division decided

that the instructions were proper under state law and Petitioner has not established that any error

so infected the trial so as to violate his constitutional rights, Petitioner's jury charge grounds are

not cognizable on federal habeas review.

### E. Excessive Sentence

Likewise, Petitioner's excessive sentence claim is not cognizable on federal habeas review. On January 19, 2000, Petitioner was sentenced, as a second felony offender, Sentencing Tr. 38, ECF No. 10-8 to: 1) an indeterminate term of twenty-two years to life for Murder in the Second Degree, Sentencing Tr. 48; an indeterminate term of three and one-half years to seven years for Reckless Endangerment in the First Degree, id.; a determinate term of twenty-one years for Attempted Murder in the Second Degree, id. 48-49; determinate terms of twenty-one years and twenty years for several counts of Assault in the First Degree, id. 49; and a determinate term of fifteen years for three counts of Criminal Possession of a Weapon in the Second Degree, id. Several of the sentences were set to run concurrently, id. 49-50; however, the assault counts were to run consecutively, id. 50-51.

An excessive-sentence claim is not cognizable on federal habeas review where the length of a sentence is within the prescribed state law range. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where ... the sentence is within the range prescribed by state law."); Alfini v. Lord, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."); see also United States v. McLean, 287 F.3d 127, 136 (2d Cir. 2002) ("[T]here is 'no constitutionally cognizable right to concurrent, rather than consecutive, sentences.'") (citation omitted).

Petitioner does not allege that the sentences imposed fell outside the prescribed range for each offense, but argues that the imposition of consecutive sentences was excessive.[51] However,

---

[51] See Br. Supp. Def.'s Direct Appeal, ECF No. 9-6 at 78 ("It is Broxton's position that the trial court's sentence of 99 years to life was an abuse of discretion. While Broxton is alleged to have conspired to have committed the acts in question, [the] People allege that he committed only three of the acts in question. Nonetheless, the trial court sentenced Broxton consecutively. Such sentence is excessive.").

under New York law, "when multiple sentences of imprisonment are imposed on a person at the same time," the court may impose that the sentences run consecutively. N.Y. Penal Law § 70.25(1). Here, Petitioner was sentenced to consecutive terms because the Court found that the assault victims were injured by separate acts, i.e., separate gunshots, Sentencing Tr. 50-51,[52] and therefore Petitioner's aggregate sentence is within the statutory range permitted by state law. Cf. Cruz v. Raymond, No. 10-CV-1491 (DLI), 2013 WL 5530641, at *7 (E.D.N.Y. Sept. 30, 2013) ("Even if the offenses were committed as part of a single transaction and even if the statutory elements of the multiple offenses overlap, consecutive sentences remain valid so long as the offenses were committed through separate and distinct acts.") (internal quotations and alterations omitted). Accordingly, Petitioner's excessive sentence claim is not cognizable on federal habeas review.[53]

---

[52] The prosecution argued for consecutive sentences based on Petitioner being principally responsible for shooting at least three people, as well as being legally responsible for injuries to all eleven people who suffered gunshot wounds under an acting-in-concert theory. Sentencing Tr. 29.

[53] Respondent argued that Petitioner's excessive sentence claim is not exhausted. Resp't's 2011 Br. n.2, ECF No. 8 at 22. When confronted with a "mixed" petition that contains exhausted and unexhausted claims, a district court can deny the unexhausted claims on the merits. See Bey v. Chappius, No. 16-CV-7084 (KAM), 2019 WL 4805401, at *7 (E.D.N.Y. Sept. 30, 2019); Benson v. Graham, No. 14-CV-06099 (JMA), 2019 WL 4917914, at *8 (E.D.N.Y. Sept. 30, 2019) ("Where the petition is a 'mixed petition,' containing both exhausted and unexhausted claims, the court can deny the unexhausted claims if they are plainly meritless.") (citing 28 U.S.C. § 2254(b)(2)); cf. Rhines v. Weber, 544 U.S. 269, 277-78 (2005) (explaining that a district court should stay a mixed petition "if the Petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the Petitioner engaged in intentionally dilatory litigation tactics."). To the extent the sentence claim is unexhausted, it should nonetheless be denied as it is not cognizable. To the extent Petitioner raises an Eighth Amendment claim, see Pet'r's Aug. 8, 2011, Ltr, ECF No. 23, the record here does not reflect the "extraordinary circumstances" required to support a claim that Petitioner's sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. See Ashby v. Senkowski, 269 F. Supp. 2d 109, 115 (E.D.N.Y. 2003) ("[T]he imposition of consecutive sentences is found to run afoul of the Eighth Amendment only under extraordinary circumstances.") (internal quotations marks and citations omitted); cf. Rodriguez v. LaValley, No. 13-CV-5811 (RJD), 2019 WL 3718022, at *15 (E.D.N.Y. Aug. 7, 2019) (quoting Edwards v. Marshall, 589 F. Supp. 2d 276, 290 (S.D.N.Y. 2008) ("[A] reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate because the decision of a sentencing court is entitled to substantial deference[.]")). See also supra note 21-22, 33 (explaining why Petitioner does not have a cognizable actual innocence claim that would make his punishment cruel and unusual).

## CONCLUSION

Accordingly, it is respectfully recommended that petitioner's application for a writ of habeas corpus should be denied. As petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds by United States v. Perez, 129 F.3d 255, 259–60 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability). It is further recommended that for purposes of an appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

## FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

SO ORDERED.

/S/ Judge Lois Bloom

Dated: March 12, 2020
     Brooklyn, New York

LOIS BLOOM
United States Magistrate Judge

---

Notwithstanding the foregoing, the Court recognizes why Petitioner challenges his sentence as unfair. Petitioner is not eligible for parole until 2087, see Resp't's Opp'n Def.'s Appl. Writ Error Coram Nobis Ex. 2, ECF No. 9-9 at 87, whereas his co-defendants, who plead guilty, received sentences of 5 and 10 years respectively. However, it is beyond this Court's power to reduce his sentence.